## FARMERS' HIGH LINE CANAL & RESERVOIR CO. ET AL. V. SOUTHWORTH.

1. IRRIGATION — CONSTITUTIONAL APPROPRIATION OF WATER OF NATURAL STREAM.— To make any diversion of water from a natural stream an *appropriation*, within the meaning of the constitution, it must be applied to some *beneficial use*, and in case of irrigation it must be actually applied to the *land*.

2. PRIORITY OF APPROPRIATIONS.— The appropriations of water by consumers who receive the same through the same ditch do not necessarily relate to the same time; but, on the contrary, such consumers may have different priorities of right.

3. Pleading — Stating Legal Conclusions.— A complaint which merely alleges a priority of appropriation of the water of a natural stream, without alleging facts showing such prior appropriation, states a conclusion of law only, and is upon demurrer fatally defective.

Per Helm, C. J.— Consumers taking water from the same carrier within a reasonable time after the carrier's diversion have the same constitutional priority dating from such diversion. And as to such consumers the prorating statute is constitutional.

Per Elliott, J.— As between those using the water of natural streams for the same beneficial purpose, priority of use gives superiority of right, irrespective of the mode of diversion; and this rule is applicable to individual consumers, as between themselves, when they receive the water through the agency of an artificial stream as well as when they receive the same direct from the natural stream. The prorating statute of 1879 (Gen. Stat., sec. 1722) must be limited accordingly.

*Appeal from District Court of Arapahoe County.*

The facts in this case necessary to a correct understanding of the opinions are sufficiently stated therein.

The constitutional and statutory provisions considered at length by the court are as follows:

Const., art. 16, § 5: "The water of every natural stream, not heretofore appropriated, within the state of Colorado, is hereby declared to be the property of the public, and the same is dedicated to the use of the people of the state, subject to appropriation as hereinafter provided."

"Sec. 6. The right to divert unappropriated waters of any natural stream to beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using the water for the same purpose; but when the waters of any natural stream are not sufficient for the service of all those desiring the use of the same, those using the water for domestic purposes shall have the preference over those claiming for any other purpose, and those using the water for agricultural purposes shall have preference over those using the same for manufacturing purposes."

Gen. St. § 1722: "If at any time any ditch or reservoir from which water is or shall be drawn for irrigation shall not be entitled to a full supply of water from the natural stream which supplies the same, the water actually received into and carried by such ditch, or held in such reservoir, shall be divided among all the consumers of water from such ditch or reservoir, as well as the owners, shareholders or stockholders thereof, as the parties purchasing water therefrom, and parties taking water partly under and by virtue of holding shares, and partly by purchasing the same, to each his share *pro rata*, according to the amount he, she or they (in cases in which several consume water jointly) shall be then entitled, so that all owners and purchasers shall suffer from the deficiency arising from the cause aforesaid each in proportion to the amount of water to which he, she or they should have received in case no such deficiency of water had occurred."

Mr. B. F. HARRINGTON and Mr. C. J. HUGHES, for appellants.

Mr. I. E. BARNUM, for appellee.

MR. JUSTICE HAYT delivered the opinion of the court.

It is alleged in the complaint that the ditch through which all the parties to this action receive water for irrigation "is composed of two ditches, the upper one formerly known as the ' Golden Canal' and the lower one formerly known as the 'Extension ditch.'" It does not, however, appear that these two ditches were constructed at the same time, nor whether water was diverted from the natural stream, which is the common source of supply, through both ditches, the same season or upon different seasons.

If, as the language seems to indicate, the lower ditch is merely an extension of the upper one, formerly known

as the "Golden Canal," it may be that those cultivating lands under the latter had acquired priorities to the use of water for the purpose of irrigation many years senior to those taking water out of the Extension ditch, and certainly the consolidation of these two ditches under one management did not operate to place such rights upon an equality in the absence of an agreement to that effect. *Rominger v. Squires,* 9 Colo. 327. The statute in reference to a *pro rata* distribution of water among all the consumers from the same ditch, in times of scarcity, when there is not sufficient for all, was certainly never intended to apply to such a case; and if such had been the legislative intent in passing the act, it would, in my judgment, be clearly in conflict with the constitutional provision "that priority of appropriation shall give the better right as between those using water for the same purpose." It was said by this court in *Thomas v. Guiraud,* 6 Colo. 533: "The true test of the appropriation of water is the successful application thereof to the beneficial use designed, and the method of diverting or carrying the same, or making such application, is immaterial." In the light of these decisions, it seems clear that, at least under some circumstances, different users of water, obtaining their supply through the same ditch, may have different priorities of right to the water; that the appropriations do not necessarily relate to the same time. In this case, therefore, although all the parties receive water through the same ditch, if plaintiff has alleged facts showing that he has a prior right to the use of water which the defendants are causing to be prorated among those having subsequent rights, the demurrer was properly overruled; otherwise it should have been sustained.

It is well established that no mere diversion of water from a stream will constitute the constitutional appropriation. To make it such it must be applied to some beneficial use, and in case of irrigation it must be actu-

ally applied to the land before the appropriation is complete. *Schilling v. Rominger*, 4 Colo. 100; *Thomas v. Guiraud, supra; Sieber v. Frink*, 7 Colo. 149; *Wheeler v. Irrigation Co.* 10 Colo. 582. In the case of *Wheeler v. Irrigation Co., supra*, Mr. Justice HELM says: "But to constitute a legal appropriation, the water diverted must be applied within a reasonable time to some beneficial use; that is to say, the diversion ripens into a valid appropriation only when the water is utilized by the consumer, though the priority of such appropriation may date, proper diligence having been used, from the commencement of the canal or ditch." It is apparent from these decisions that the priority of appropriation which gives the better right is a legal conclusion, resulting from certain facts — the diversion of water from the stream, and its application to a beneficial use. Under the code provision, requiring the complaint to contain "a statement of the facts constituting the cause of action in ordinary and concise language, without unnecessary repetition," these facts should have been stated in the complaint, and not the legal conclusion. An examination of the pleading under consideration discloses the plaintiff's claim to be that he has a priority from the natural stream, and that he has heretofore employed the owners of said ditch to convey said water, etc.; but the pleading fails to state the facts upon which such priority must rest if it exists. The complaint contains no averment as to the time at which appellee first diverted the water, and nothing is alleged in reference to the application thereof to his lands. It is entirely silent in reference to these important matters. The only allegations in reference thereto occur in the fifth and eighth paragraphs of the complaint, which paragraphs are as follows, to wit:

"*Fifth.* That the plaintiff has a priority to the use of such an amount of water from said creek that, after evaporation and leakage in the carriage, there shall be

and remain one hundred inches thereof when turned from said ditches into the lateral ditch leading to said land, for the purpose of irrigating said land, dated from about the 1st day of April, A. D. 1881, and that he has heretofore employed the owners of said ditch to convey said water through said ditches to the head-gate of the lateral ditch leading from said Extension ditch to the lands of said plaintiff."

"*Eighth.* That there is plenty of water in said creek that is unappropriated on any priority antedating said priority of the plaintiff to fully furnish said one hundred inches of water to the plaintiff, but said defendant wrongfully and fraudulently refuses to furnish the same, and threatens that it will not furnish the same, during said season, in case there is not water enough for all priorities, and that it will make the plaintiff prorate the water in said ditch with a large number of priorities that are subsequent in time to the said priority of the plaintiff; and that said subsequent priorities are for the purpose of irrigating, except a very small amount that may be used for domestic purposes; and that he will have to abandon the same if that is done."

In view of this pleading I am unable to agree with the deduction drawn by the Chief Justice, which, as stated by him, is: "The question propounded in this case resolves itself into the following: May the legislature provide that in times of scarcity water shall be prorated among consumers having priorities of the same date?"

Of course, there can be but one answer to this question; but in my judgment no such question is presented by the pleadings. On the contrary, the plaintiff expressly alleges that he has a priority, and that the defendants' right is subsequent in point of time to such priority. This is either a good allegation or it is not. If the averment "that the plaintiff has a priority," etc., is to be treated as the statement of a fact, rather than as a conclusion of law resulting from certain facts, it stands

confessed as against this demurrer, and the plaintiff has shown such a superior right in himself as is expressly recognized by the constitution, and one that neither the courts nor the legislature can take away or impair. In my opinion, however, it is an averment of a mere legal conclusion; and as it is well settled that the statement of a legal conclusion, resulting from certain facts, without stating the facts, will not meet the code requirement, the complaint should be held insufficient.

The rule requiring the facts relied upon by the plaintiff to entitle him to a recovery to be stated in the complaint contains the fundamental and most important principle of the reformed system of pleading. It is not technical, but substantial; not a useless requirement, but necessary to advise the opposite party and the court of the true nature and object of the suit; and the courts are not at liberty to disregard the statute or supply a statement for the purpose of aiding a pleading otherwise radically defective.

In the case at bar the sufficiency of the complaint was promptly challenged by the defendants by a demurrer which should have been sustained. It will be time enough to determine whether or not the prorating provisions of the statute of 1879 can be carried into effect in a given case without infringing upon vested rights, when it is made to appear by his pleading that the party complaining has such rights, and that the same will be endangered by some action taken or threatened under the statute. Such a case is not before us, and it appearing that the term of plaintiff's alleged contract with the defendant company has long since expired, is an additional argument against pursuing this investigation further.

For the reasons stated, I am of the opinion that the judgment should be reversed.

Helm, C. J. The complaint states certain conclusions of law, and might have been more artificially drawn in

other respects; but, after eliminating these legal conclusions, the following alleged facts may, I think, be fairly gathered from the remaining averments, viz.: That defendant, the High Line Company, is a corporation duly organized under the laws of the state, and is doing business as a carrier of water; that plaintiff is a consumer on the line of defendant's canal; that on or about the 1st of April, 1881, plaintiff procured water through defendant's canal to irrigate his land, which use has not been abandoned; that plaintiff paid, and defendant accepted, the charge for transporting to him during the season of 1887 the quantity of water previously used by him; but that defendant, there being a probable scarcity, threatens to prorate, and has taken steps so to do, the diminished quantity to which the canal will be entitled, between plaintiff and certain consumers who began taking from defendant's canal subsequent to the said 1st day of April, 1881.

The object of the action is to enjoin such prorating, and compel defendant to allow plaintiff the entire quantity heretofore used by him, regardless of the interests of those co-consumers whose use post-dates that of plaintiff, and regardless of the command embodied in the prorating statute.

The question which I shall presently state, predicated upon the foregoing alleged facts, is fairly presented by the pleadings. So thought the court below, and the question alluded to was there determined on its merits. Both parties are anxious to have this important subject of controversy adjudicated by this court also; and I shall, without further discussion, assume that the matters relied on are sufficiently stated, and proceed to show why these matters do not constitute a cause of action.

But before doing this, I pause briefly to remark that the case at bar is not analogous to that of *Rominger v. Squires*, 9 Colo. 327, upon which reliance is placed. While the complaint avers that defendant's canal "is

composed of two ditches," this pleading nowhere alleges, nor is it even claimed in argument, that plaintiff originally appropriated water or acquired any water-right whatever through either of the two ditches thus combined. Plaintiff did not have, nor does he claim to have had, an existing priority to be "surrendered" or "merged" upon the construction of defendant's canal. The case mentioned is based upon the established principle that by changing his point of diversion, without encroachment upon intervening rights, an appropriator of water does not invalidate his appropriation, or lose his priority in connection therewith. If two appropriators abandon their separate ditches, and convey through one canal the water previously diverted and used by each, it is clear that, as between themselves, their respective priorities will, in the absence of contract, remain undisturbed. But it is sufficient to repeat that no such case is here presented.

In my judgment the alleged facts above detailed, which are admitted by the demurrer to be true, require an answer to the following question: Does the "priority of appropriation," which by virtue of the constitution gives the better right, apply to individual consumers taking water through the agency of a carrier, so that, notwithstanding the prorating statute, each consumer acquires a separate constitutional priority of right, entitled to judicial enforcement, dating from the beginning of his specific use?

If this question be answered affirmatively, the statute is void and the complaint states a cause of action; if answered in the negative, the statute is in this respect valid and the demurrer should have been sustained.

The words "carrier" and "consumer" will be used throughout this opinion as in *Wheeler v. Irrigation Co.* 10 Colo. 582, meaning the canal company and tiller of the soil, respectively. The word "co-consumer" will also, for convenience, be applied exclusively to consumers taking from the same artificial stream.

The constitution recognizes priorities only among those taking water from natural streams. Therefore, to constitute an appropriation such as is recognized and protected by that instrument, the essential act of diversion, with which is coupled the essential act of use, must have reference to the natural stream. But the consumer himself makes no diversion from the natural stream. The act of turning water from the carrier's canal into his lateral cannot be regarded as a diversion within the meaning of the constitution; nor can this act of itself, when combined with the use, create a valid constitutional appropriation. There is therefore no escape from the conclusion hitherto announced by this court, that in cases like the present the carrier's diversion from the natural stream must unite with the consumer's use in order that there may be a complete appropriation within the meaning of our fundamental law. *Wheeler v. Irrigation Co., supra.*

The carrier makes a diversion both in fact and in law. This diversion is accomplished through an agency (the carrier) recognized by the constitution and statutes, and for purposes expressly named in both; hence it cannot be challenged as illegal. It would undoubtedly become unlawful were the water diverted not applied to beneficial uses within a reasonable time; but, when thus applied, the diversion unquestionably ripens into a perfect appropriation.

If the consumer applies water to a beneficial use within a reasonable time after the carrier's diversion, the appropriation relates for its priority back to such diversion. This proposition was in effect announced in *Wheeler v. Irrigation Co., supra.* It is substantially a restatement of the uncontroverted doctrine that the appropriator's right, proper diligence being employed, dates from the beginning of his ditch. There may, of course, be secondary diversions (to which the rights of secondary consumers relate) through subsequent lawful enlargements of the quantity of water legally taken in the first instance.

And I do not say that the legislature may not fix a reasonable period within which use must follow diversion in order to constitute a valid appropriation.

The foregoing view is not a recognition of ownership in the carrier, save of its canal; nor does it in the slightest manner detract from the consumer's constitutional right of user. The carrier in and of itself has no independent priority (though the irrigation statutes use language that might give this impression), and any rights it may hold in connection with the water diverted depend for their continuance upon the use made by consumers. The carrier becomes the consumer's agent, and its labors clearly inure to his benefit. By taking from its canal the consumer recognizes and ratifies its acts of construction and diversion, making them his own. And the situation, so far as this question is concerned, is not different from what it would have been had the consumer in fact employed the carrier to construct the canal for himself alone.

It is obvious from the foregoing that, in my judgment, all co-consumers taking water within a reasonable time have priorities of even date with each other. And the question propounded in this case resolves itself into the following: May the legislature provide that in times of scarcity water shall be prorated among consumers having priorities of the same date? For, if any of the co-consumers referred to in plaintiff's complaint did not use the water claimed by them within a reasonable time from the date of defendant's diversion, the fact was material and should have been pleaded. The question as thus restated can receive but one answer. The legislative right to provide this, as well as all other reasonable regulations not obnoxious to constitutional objection, for the use and distribution of water, cannot be denied.

There is nothing in the assertion that the prorating statute, in so far, at least, as it applies to cases like the one at bar, is class legislation, and for that reason void.

It is in this respect purely remedial. It was not intended, nor does it operate, to inflict burdens; its intent and its operation was and is to distribute them. It reaches all consumers having secured priorities through diversion by carriers alike; it makes no distinction among them; each and all are equally within its purview.

This is purely a question of constitutional construction, and the constitutional meaning does not seem to be obscured by any serious ambiguity; but were the meaning doubtful, the argument, based upon supposed hardship and injustice, is, in my judgment, not entitled to notice. It is true, the consumer who first uses may be compelled to prorate with another whose use is subsequent in date. But each consumer has a perfect right to go to the natural stream for the water he needs. There is no law forcing him to deal with the carrier. It is no answer to say that the overpowering law of necessity takes away his volition to choose; for he in fact makes his election when he purchases land so far from the natural stream as to compel reliance upon the carrier.

But when he elects to take from the carrier's canal, and thus to employ this lawful agency, he cannot reject the accompanying lawful obligations. The legislature is powerless to say that he shall not take unappropriated water from the natural stream; but that body can declare that if he employs the services of a carrier he shall take notice of and be governed by such valid regulations as have been adopted pertaining to the distributions of water thereby.

Under the constitution, statutes and decisions, as I read them, the consumer takes with full knowledge that the carrier's entire diversion will ripen into valid appropriations, provided the water be applied within a reasonable time to beneficial uses. He also takes with knowledge that the different lawful co-consumers will have the same priority — a priority resting for its commencement upon the carrier's diversion, or dating from a sub-

sequent enlargement of the quantity of water to which the carrier was originally entitled. He must therefore be presumed to know that in times of scarcity his use may be subjected to two interruptions, viz.: *First*, that canals and ditches holding priorities antedating the diversion of his carrier may demand all the water in the natural stream, so that there will be none for him or any of his co-consumers; and *second*, that if there is water, but not the full quantity appropriated, he will be obliged to prorate with such co-consumers. Under these circumstances the consumer is hardly in position to resist the enforcement of the prorating statute or to assert that it operates harshly and unjustly upon him.

The rule relating to legislative interpretation may be invoked in support of the foregoing construction. In 1879, less than three years after the adoption of our constitution, the legislature enacted a law for the settlement of priorities of right to water. This law covered reservoirs and carriers' canals used in storing and delivering water to consumers, as well as private or partnership canals and ditches. By virtue of its provisions a priority was to be awarded the carrier's canal according to the date of diversion of water thereby from the natural stream, and the quantity diverted and used; but no distinct and independent priority in the consumer was in any way recognized, though he is expressly authorized to testify concerning that of the carrier. If I understand this law aright, the priority thus awarded the carrier's canal was intended to inure to the benefit of all consumers taking water therefrom, and to fix the priority of their respective appropriations. The legislature of 1881 revised this act, making numerous changes, but retained and redeclared the conspicuous feature above named. The general assemblies of 1885 and 1887 each in turn again dealt with the subject, but adhered strictly to the theory in this respect adopted by their predecessors. The prorating provision here challenged was also embodied in the legis-

lation of 1879, and has since been retained undisturbed. I shall not rely upon the fact, because it is not in the record, that the legislature of 1889 positively refused to repeal or modify this provision, though the change was strenuously urged upon the members of that body.

The view I have taken is therefore in harmony with the construction adopted by the legislature. In my judgment this view also greatly simplifies the perplexing problem of water-rights, which is unsurpassed in difficulty by any other subject known to our legislation or jurisprudence.

I would conclude this opinion here were it not for the fact that others, including one of my colleagues on the bench, are firmly convinced that the foregoing construction of the constitution is unsound. They contend that the constitution guaranties to each consumer a priority dating from the commencement of his individual use. The carrier's original diversion, say they, has nothing to do with the consumer's priority; it is as if the consumer, at the date of his use, made a distinct and independent diversion from the natural stream, merely employing for the purpose the carrier's canal; and upon this constructive diversion rests the superstructure of their theory regarding the consumer's appropriation and priority.

To what has already been said may be added the following considerations which preclude the adoption of this view:

*First.* It is wholly impracticable; hence it would operate to defeat the beneficent purpose of the constitutional provision upon which reliance is placed.

The protection awarded in connection with a consumer's constitutional priority extends to controversies between him and all his co-consumers, though their number be legion; but the assertion of his rights cannot be limited to such controversies. He is necessarily entitled to the quantity of water covered by his appropriation as against all others obtaining water at a later

period, directly or indirectly, from the same natural stream. The priorities of all appropriators from a given natural stream, whether employing carriers or constructing private ditches, must be adjudicated, and the prior right of each must be sustained. The total number of ditches taking water from a natural stream may be one hundred; the total number of persons receiving water through these ditches may aggregate five thousand. There are already, in the state, carriers who each supply several hundred consumers. No serious difficulty would be encountered in adjudicating priorities as between the one hundred ditches; but to the satisfactory adjustment and maintenance of separate priorities belonging to the five thousand individual consumers, all the available judicial machinery, if it did nothing else, would prove inadequate.

. Not only must there be a priority for each consumer corresponding, according to the view we are now considering, with the date of his first application to use, but there must also be an additional priority for each subsequent enlargement of the quantity of water taken by him. Besides, certain consumers will abandon the use of water from the carrier, and other consumers will secure the right to the use thus abandoned. In each case of this kind the old priority must be dropped and the new priority recognized. This new priority then becomes a factor in re-adjusting the five thousand priorities. Nor is the quantity of water appropriated at all significant. The appropriation, whether it be enough for five or five hundred acres, is to receive precisely the same recognition. Moreover, all these priorities are to be accurately determined as well as impartially protected. They depend upon the dates of the respective applications to use, and these dates must be ascertained with reference not merely to years nor to months, nor even to weeks, but also with reference to days.

There is no exaggeration in the foregoing; for, if the

constitution gives each consumer a priority from the date of his individual use, the legislature can adopt no rule that shall prevent the assertion of this constitutional right.    That body, under the supposition mentioned, has no power to say that a consumer from the same or another canal, who began using a month, a week, or even a day, later than he, shall be his equal in this regard.

*Second.*    The view urged upon us renders all legislation heretofore adopted, looking to the adjustment of priorities to the use of water, largely delusive.    Under it other provisions besides the prorating section must fall. In so far as these statutes provide for the adjudication of priorities to reservoirs and canals constructed for storing and supplying consumers with water, they are worse than useless.    In all water districts containing such reservoirs or canals, the time, labor and money heretofore expended in settling priorities have been expended largely in vain.    The adjudications upon which people confidently rely, and upon the strength of which, in many instances, property rights have been acquired, are no longer final or binding.    Any consumer has, under this view, the constitutional right to call for a re-adjustment of priorities based upon the date of his individual use.    In such case not only must the re-adjustment assign to him a priority with reference to his co-consumers, but the rearrangement of priorities must also include consumers from other canals as well as individual appropriators diverting water from the same natural stream; for, as already suggested, the alleged constitutional right of the consumer, if it in fact exists, cannot be confined to controversies with those taking from the same artificial stream; it relates to the natural stream, and he must be permitted to contest priorities with all parties taking directly or indirectly therefrom.

To avoid, at least in part, the foregoing disastrous consequences, an ingenious theory is advanced.    It is gravely argued that we have in this state a double system — more

properly speaking, two systems — of priorities.  The police power of the state is appealed to.  It is said that the legislature has, as a police regulation, directed the ascer· tainment of priorities as between the canals and ditches themselves; and it is also asserted that the supposed constitutional priority of the individual consumers is at the same time recognized and protected; that is to say, a system of priorities based upon the dates of diversion by carriers, canals and private ditches co-exists with a system of priorities resting upon the dates of use by the individual consumers.   Through the former system, it is maintained, confusion and conflict in the diversion by such canals and ditches are avoided, and an orderly apportionment of water is secured; while by the latter system the constitutional rights of individual consumers are recognized and enforced.

This theory reads well, but the feasibility of its practical application must be doubted.  Unfortunately both systems must be applied to the same identical water at the same identical time; that is, a canal prior in diversion is under one system to receive its one thousand inches of water, while the consumer prior in use, but taking from a canal later in diversion, is, under the other system, secured precedence to five hundred of the same one thousand inches of water.   But how can the prior canal and the earlier consumer who takes from the later canal both secure at the same time the same identical water?   This crude illustration shows the utter impracticability of the theory.   The two systems are in hopeless conflict.  The supposed constitutional priority of the consumer supersedes the supposed statutory priority of the canal, and whenever the arrangement of the consumers' constitutional priorities conflicts with the arrangement of the carriers' statutory priorities the latter must inevitably give way.

It seems to me that the statutes themselves tend largely to negative the double system priority theory.

In the *first* place, as we have seen, they provide for the adjustment of ditch and canal priorities with reference to their respective diversions; *secondly,* they do not provide for settling the consumers' separate priorities dating from their respective uses, nor do they make any reference thereto; and *thirdly,* a right on the part of consumers to be heard upon the adjudication of the canal priorities is carefully asserted. If the consumer's reliance is upon a constitutional priority dating from his individual use, it can matter little to him what priority be assigned to the carrier's diversion; his priority of right and consequent interest are neither benefited nor injured by the priority of his carrier. Why should the legislature be so neglectful of his real welfare, and yet so carefully extend to him a right so useless to his personal interest or advancement? Do not these things tend to show that the legislature recognized the consumer's appropriation as resting upon the carrier's diversion for its priority, and that for this reason that body not only made no reference to a separate priority, but inserted the very equitable command that before his rights in the premises were determined the consumer should have his day in court?

Objections to the view under consideration might be multiplied; but the foregoing are amply sufficient to demonstrate that the framers of the constitution anticipated no such construction of the language employed. The provisions of that instrument were adopted with more than ordinary foresight and wisdom. They were intended to be practicable, and to secure the wisest and most beneficial use possible of the waters flowing in the natural streams of the state. No Utopian notion regarding rights that cannot be enforced was indulged in, and no interpretation should be sanctioned that in effect nullifies, so far as its usefulness is concerned, an important part of the provision.

The prorating statute, which we are asked to declare

unconstitutional, does not take away the consumer's right to water; it simply regulates the use of this right. I do not say that under no circumstances can any portion of this provision be challenged as unconstitutional, but I do say that the present arraignment thereof is unfounded, and that as to plaintiff, and other consumers similarly situated, it should be upheld. There is not such a clear repugnancy to the constitution, in the particular under consideration, as justifies this court in holding the statute void. The consumer's constitutional rights must, of course, be preserved; but it is hardly less important that the legislative authority to adopt regulations which shall advance the wise purpose of the constitutional provision, and promote the true interests of consumers themselves, be maintained.

There is no force in the argument that the construction contended for is necessary in order to prevent carriers from contracting to carry more water than they have a right to transport; nor is the suggestion more pertinent that without such construction the carrier will collect the annual rates for carriage from consumers, put the money in its coffers, and then say that it cannot deliver the water. In the first place, a contract to carry more water than has been lawfully diverted would be unlawful; and to prevent injuries resulting therefrom, or to recover damages in case the injuries are suffered, ample legal remedies exist. And secondly, whether in times of scarcity the water available be distributed equitably among all its consumers, or whether it be delivered to a small number thereof, is a matter of no interest to the carrier; in the absence of statutory regulation it will continue collecting its charge for transportation at the beginning of the season, and then, if there be a scarcity, will refer the complaining consumer, who receives no water or a diminished quantity, as the case may be, to the decision of this court for authority in support of its action.

The demurrer should have been sustained, and the judgment of the district court should be reversed.

ELLIOTT, J.   The constitutional question involved in this controversy is one of vital importance to the welfare of our people, and the determination thereof by this court must be far-reaching in its consequences to those engaged in agricultural pursuits.   Hence, while concurring in the opinion of Mr. Justice HAYT, a further expression of opinion upon the merits of the question so fully argued by counsel seems desirable at this time.

The question under consideration may be stated thus: Does the "priority of appropriation," which the constitution declares "shall give the better right as between those using the water for the same purpose," apply to the individual consumer taking the water through the agency of an artificial stream, or is it limited to those taking water directly from the natural stream?

The appropriation of water, within the meaning of the constitution, consists of two acts — *First*, the diversion of the water from the natural stream; and *second,* the application thereof to beneficial use.   These two acts may be performed by the same or different persons; but the appropriation is not complete until the two are conjoined.   Hence, when the acts are performed by different persons at different times, it becomes necessary to determine which is the essential act to which the "better right" attaches.

It will be observed that, by the express language of the constitution, the "better right" is guarantied "as between those using the water for the same purpose." The different purposes specified are domestic, agricultural and mechanical.   Whether there are other purposes not specified need not now be discussed.   Can the carrier of water for hire be said to be using the water in the sense spoken of in the constitution?   The railroad company, which carries farming implements from the

great manufactories of the east to supply the farmers residing upon the broad prairies of the west, can hardly be said to be *using* such implements by the mere act of thus transporting them. From the specification of the purposes for which the water may be used it would seem that the "better right" which attaches to the priority of appropriation was primarily intended for the benefit of those who apply the water to the cultivation of the soil or other beneficial use, rather than for the benefit of those engaged in diverting and carrying it to be used by others. The diversion and carriage of water in point of time are necessarily prior to the application of it to agricultural or other useful purposes; but they are subordinate in point of right. The former are to the latter as the means to the end,—an end without which neither the diversion nor the carriage would be lawful. The carrier is the agent, the consumer is the principal. The former can lawfully pursue his occupation only by virtue of the service he renders to the latter. The consumer's right is primary, and unconditional; the carrier's is secondary, and dependent.

It is claimed that "the constitution recognizes priorities only among those taking water from natural streams." A reference to sections 5 and 6, article 16, will show that it is the water *of* natural streams, irrespective of the mode of diversion, that is dedicated to the use of the people, subject to appropriation; and priority of right thereto is made to depend upon the time of using the water for beneficial purposes, and not upon the fact of taking the water *from* the natural stream. Indeed, the word "from" does not appear in either of the foregoing sections; but it is not necessary to rely upon mere verbal analysis to sustain the consumer's priority of right based upon priority of use. Every consumer cannot take the water directly *from* the natural stream. Irrigating ditches and canals must be resorted to as a means of diverting and carrying the water to places where it

can be beneficially applied. No good reason can be urged why a consumer obliged to make use of such agency should not be protected equally with those taking water directly *from* natural streams.

The foregoing views are believed to be in harmony with the several opinions of this court upon the subject of water-rights. In the case of *Thomas v. Guiraud*, 6 Colo. 530, it is said: "The true test of appropriation of water is the successful application thereof to the beneficial use designed, and the method of diverting or carrying the same, or making such application, is immaterial."

In the case of *Wheeler v. Irrigation Co.* 10 Colo. 582, Mr. Justice HELM used the terms "carrier" and "consumer," as used in this opinion, to denote the party diverting and conveying the water, and the party applying the same to beneficial uses, respectively. In delivering the opinion of the court in that case the learned justice says: "The diversion ripens into a valid appropriation only when the water is utilized by the consumer." Speaking of the rights of the carrier, he declares: "They are dependent for their birth and continued existence upon the use made by the consumer." The same opinion is authority for the doctrine that neither the title nor a salable interest in the water of natural streams vests in the carrier by means of his diversion or carriage thereof, but the ownership remains in the public, "save, perhaps, as to the limited quantity that may be actually flowing in the consumer's ditch or lateral."

In *Rominger v. Squires*, 9 Colo. 328, there was a consolidation of two ditches forming a new one, which was to supply the consumers from the two old ditches, and the question arose as to what were the relative rights of the several consumers in respect to priority of right to the use of water under the consolidation. The appellee attempted to maintain that "the appropriations of water by the different parties were to be referred to the same date," and the district court so held. But this court, Mr.

Justice Elbert delivering the opinion, held that the priorities of the consumers had not been waived; that the finding of the district court was not supported by the evidence,— the learned justice remarking "that while the agreement provided for a change of the *water-way*, it in no wise contemplated or provided for a change of *water-rights*. Having reference to their rights in the old ditches, the evidence shows priority of appropriation on the part of several of the original constructors of the new ditch, and among others Saalfeldt, the grantor of the defendant Rominger. Water-rights in this state, where agriculture is almost exclusively carried on by means of irrigation, are valuable properties. * * * It is not reasonable to suppose that priority of right to water, where water is scarce or likely to become so, will be lightly sacrificed or surrendered by its owner; nor should the owner of such a right be held to have surrendered it or merged it, except upon reasonably clear and satisfactory evidence."

In *Coffin v. Ditch Co.* 6 Colo. 446, similar views were expressed, as follows: "Houses have been built and permanent improvements made, the soil has been cultivated, and thousands of acres have been rendered immensely valuable, with the understanding that appropriations of water would be protected. Deny the doctrine of priority or superiority of right by priority of appropriation, and a great part of the value of all this property is at once destroyed." The latter opinion is also authority for the doctrine that priority of right to water by priority of appropriation is older than the constitution itself, and has existed from the date of the earliest appropriations of water within the boundaries of Colorado. From these opinions the conclusion seems inevitable that the "better right," acquired by priority of appropriation, is applicable to individual consumers as between themselves when they receive the water through the agency of an artificial stream, as well as when they receive the same

direct from the natural stream. Also, that if the pro-rating of the water actually received into an irrigating ditch in time of scarcity between all the consumers can be effected by legislative enactment, then the superiority of right acquired by priority of appropriation is without protection or security; and houses and other permanent improvements of prior appropriators may be rendered comparatively valueless.

Since the doctrine of priority of appropriation is applicable primarily to the consumer, it may be asked, what, then, are the objects and purposes of the acts of 1879 and 1881, providing for the determination of priority of rights to the use of water for irrigation between ditches, canals and reservoirs? The question is not as difficult to answer as might at first appear. They are in the nature of police regulations to secure the orderly distribution of water for irrigation purposes, and to this end they provide a system of procedure for determining the priority of rights as between the carriers. This opinion must not be understood as denying that carriers may acquire and enjoy certain rights resulting from priority of appropriation (strictly speaking, priority of diversion) as between themselves. In a certain sense they may be said to be "using the water for the same purpose," and so, by analogy, may be termed "appropriators," or "*quasi* appropriators," of water. Hence, to secure and protect these rights, and to prevent conflicts which otherwise would almost inevitably ensue if the diversion of water from the natural streams were not placed under governmental control, the acts of 1879 and 1881 were passed. While, under these acts, carriers are recognized as having priorities of right to the use of water by appropriation as between themselves, yet the act of 1881 very clearly indicates that these priorities are dependent upon the carriers supplying the water to actual consumers. Section 1 requires that the statement to be filed by the party claiming a priority for any ditch, canal or reservoir shall set

forth "the number of acres of lands lying under and being, or proposed to be, irrigated by water from such ditch, canal or reservoir." Section 4 of the same act says: "It shall be the duty of the court to proceed to hear all evidence which may be offered by or on behalf of any person, association or corporation interested in any ditch, canal or reservoir in such district, either as owner or consumer of water therefrom, in support of or against any claim or claims of priority of appropriation of water made by means of any ditch, canal or reservoir.   *   *   *"

In passing these acts our legislators evidently considered that the priorities of carriers might be determined and regulated as between themselves; but they were careful to base these priorities upon the service to be rendered thereby to actual consumers.   The carrier's priority of right to water is established and regulated by statute as a matter of convenience; the consumer's priority is based upon the laws of nature *ex necessitate rei*.   It has existed from the date of the earliest appropriations of water in this country; it was recognized and firmly engrafted into the constitution. *Schilling v. Rominger*, 4 Colo. 104; *Coffin v. Ditch Co.*, *supra*.

Section 4 of the act of 1879 (Gen. St. § 1722) provides for prorating the water actually received into and carried by any irrigating ditch, canal or reservoir among all the consumers therefrom in time of scarcity, so that all such consumers shall suffer proportionately from the deficiency of water.   This provision may be properly carried into effect when the rights of all the consumers are equal in the matter of their respective appropriations, as when a ditch has been constructed as a common enterprise by and for the mutual and equal benefit of all the consumers therefrom, or when, by reason of contractual relations, waiver, or other circumstances, certain consumers stand on a footing of substantial and practical equality, having no priority of appropriation one over another.

*Schilling v. Rominger, supra.* In *Dorr v. Hammond,* 7 Colo. 83, it is held that a consumer may forfeit his priority of right to the use of water by abandonment through non-user; but where it appears as a matter of fact that one person has been accustomed, in a lawful manner, through the agency of an artificial stream or otherwise, to take and apply the unappropriated waters of a natural stream to proper beneficial use, without waiver or abandonment, from a period antedating such taking and use by others, then, to the extent of such prior taking and use, a *prima facie* priority is established, and the statutory regulation for prorating must give way to the "better right" acquired by such priority of appropriation under the constitution, and such priority must be respected by the ditch company, its officers and managers, and all others in any way connected therewith. Giving said section 4 a literal and unqualified interpretation, and it manifestly conflicts with the constitution; besides, as we have seen, the uniform decisions of this court plainly indicate the rule to be that, as between those using the water of natural streams for the same beneficial purpose, priority of use gives superiority of right, irrespective of the mode of diversion.

A single illustration will suffice to show the disastrous consequences which would ensue if the prorating statute should be made the rule for the distribution of water for purposes of irrigation, instead of the rule of priority. An irrigating ditch is constructed, the first and only one taking water from a small natural stream. The first year five consumers apply for and receive each one hundred inches of water for the irrigation of their lands; the next year, the ditch being enlarged, five more apply and receive a like quantity; and the third year, five more; and so on successively until thirty or forty consumers are located under the ditch. Perhaps the first five might be required to prorate with each other in time of scarcity, should their appropriations be practically equal in

point of time; but under the statute the first five would also be compelled to prorate with all subsequent consumers until the amount of water that each would receive would become so infinitesimally small as to be of no practical value, and would eventually be entirely wasted before it could be applied. It requires a volume or "head" of water to irrigate successfully. Under circumstances like these, what mockery to contend that the prorating statute is "a reasonable regulation" provided for the distribution of water to the early settlers and prior appropriators who bought and improved their lands and expended their money, relying upon the doctrine that "priority of appropriation shall give the better right as between those using the water for the same purpose!"

It may be said that the foregoing illustration is founded upon an extreme and unusual case; but extreme cases are often necessary to test the correctness of general rules. It may also be claimed that, as an irrigating ditch acquires an additional priority for each enlargement, the statutory rule for prorating is to be enforced only as between those receiving water under the same priority. The unanswerable reply to this claim is that such is not the language of the prorating statute; nor does such appear to be the *status* of defendants as shown by the complaint in this action. If defendants are in fact entitled to prorate with plaintiff, they may undoubtedly by answer set forth any facts from which such right arises.

The responsibility of thus limiting the operation of the prorating statute has been fully considered. The authority of the general assembly to enact laws regulating the distribution of water to actual appropriators, provided they do not substantially affect constitutional or vested rights, is undoubted; and the doctrine that it is the duty of the courts to uphold and enforce every act of the general assembly within the sphere of civil government, so far as the same is not in palpable conflict with the constitution, is recognized and admitted to its fullest extent,

as it has been by the repeated decisions of this court. The acts of 1879 and 1881, providing for determining the priorities of the several ditch-owners taking water from the same natural stream, as between themselves, are altogether reasonable and proper; and since the adjudication of such priorities is based upon the priorities of the actual consumers from such ditches, there would seem to be no room for conflict between the consumers and the ditch-owners in reference thereto. The plaintiff in this action does not seek to interfere with such adjudications; hence what has been said upon that subject was for the purpose of excluding the inference that there was any intention by this opinion to disturb the decrees entered in pursuance of the acts of 1879 and 1881, adjudicating the priorities as between the owners of ditches, canals or reservoirs. All that plaintiff asks is that the defendant company shall at all times in distributing the water actually received into its ditch respect plaintiff's priority of right to the use thereof, and not impair or destroy such right by prorating the water in time of scarcity among those consumers whose rights were acquired subsequent to those of plaintiff. Thus all apprehensions of difficulty or confusion from a double system of priorities are shown to be without foundation, and the lawful enjoyment of water-rights is secured to all classes, according to their respective priorities, by a mode of procedure at once plain, simple, business-like and just. The state, through its appropriate officers, distributes the water to the carriers according to the statutory adjudications of their respective priorities; the carriers redistribute the water thus received to their consumers according to their respective priorities, based upon user, unless by contract or waiver they have consented to a prorating, or by abandonment or other circumstances have forfeited their prior rights. This mode of procedure is analogous to that adopted in all extensive governmental or business enterprises for the orderly management of large, interests.

The division and subdivision of labor, responsibility and numerical force prevent complications and insure efficiency and justice.

Thus far the important question involved in this case has been considered as the same was argued by counsel upon both sides.    It is contended, however, that the demurrer challenging the sufficiency of the complaint, in its statement of facts, is well taken upon other grounds, some of which are extremely technical, and will not be noticed in this opinion.    A high standard of technical accuracy in the preparation of pleadings in irrigation cases should not be required, lest the products of the soil be destroyed while time is wasted on mere matters of form.    A plain statement of the substantial facts should be held sufficient.

In this case it is averred in the complaint, in substance, that the plaintiff has a priority to the use of water through the ditch of the defendant company for the irrigation of his lands, antedating the priorities of the other defendants.    Even if this averment, which would seem to be only a legal conclusion, should be held sufficient, there still remains the substantial defect that the complaint nowhere states that plaintiff has in fact been accustomed to take and apply the water, without waiver or abandonment, or at all, to the irrigation of his crops or trees.    It was error, therefore, to overrule the demurrer.

Notwithstanding I heard and determined the demurrer in the court below, the importance of the questions involved, and the diverse views of the different members of the court, have caused me to depart from my usual custom, and to participate fully in the review of the case in this court.    I concur in the reversal of the case for the reasons stated in this opinion.

*Reversed.*